Approved: _____
Christopher D. Brumwell
Assistant United States Attorney

Before:   HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - -   x
                                      :   **Sealed Complaint**
UNITED STATES OF AMERICA              :
        - v. -                        :   Violations of
                                      :   18 U.S.C. § 1951
HIBAH LEE,                            :
    a/k/a "Vicious," and              :   COUNTY OF OFFENSE:
CARL SCOTT,                           :   WESTCHESTER
    a/k/a "Boo,"                      :
                                      :      19m 468
                   Defendants.        :
- - - - - - - - - - - - - - - - - -   x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JAMES MENTON, being duly sworn, deposes and says that he is
a Task Force Officer with the Federal Bureau of Investigation
("FBI"), and charges as follows:

### COUNT ONE
(Conspiracy to Commit Hobbs Act Robbery)

     1.    From on or about December 28, 2018, up to and
including January 7, 2019, in the Southern District of New York,
HIBAH LEE, a/k/a "Vicious," and CARL SCOTT, a/k/a "Boo," the
defendants, and others known and unknown, knowingly did combine,
conspire, confederate, and agree together and with each other to
commit robbery, as that term is defined in Title 18, United
States Code, Section 1951(b)(1), and thereby obstruct, delay,
and affect commerce and the movement of articles and commodities
in commerce, as that term is defined in Title 18, United States
Code, Section 1951(b)(3), to wit, LEE and SCOTT conspired to
carry out a robbery of a marijuana trafficker at a hotel in
Westchester County.

     (Title 18, United States Code, Section 1951.)

     The bases for my knowledge and for the foregoing charges
are, in part, as follows:

2.    I am a Task Force Officer with the FBI, and I have been involved in the investigation of the above-described offenses.  I am familiar with the facts and circumstances set forth below based on my review of pertinent documents, from my conversations with fellow law enforcement officers, [and from my personal observation].  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.    On or about December 27, 2018, a Confidential Source ("CS-1") admitted to me and another member of law enforcement that he had carried out a robbery of a marijuana dealer with HIBAH LEE, a/k/a "Vicious," the defendant, and others in or around the parking area of an apartment building in New Rochelle, New York in or around April 2018 (the "New Rochelle Robbery").[1]  After making this admission, CS-1 told me that he was still in contact with LEE.  CS-1 agreed that he would work with me and other members of law enforcement to arrange a supposed armed robbery of a marijuana dealer with LEE.

4.    On or about December 28, 2018, at my direction and the direction of other members of law enforcement, CS-1 contacted HIBAH LEE, a/k/a "Vicious," the defendant, by telephone.  I and other members of law enforcement recorded that call and observed CI-1 during the call.  I have reviewed the recording of this call.  During the course of this call, LEE and CS-1 said, in substance and in part, the following:

a.    CS-1 told LEE that he had arranged to purchase ten pounds of marijuana on December 30, 2018 at a hotel from a

---

[1] CS-1 has been on federal supervised release since on or about January 12, 2018, and admitted that he participated in the New Rochelle Robbery during his supervised release.  The Court has been notified of this violation of CS-1's supervised release.  CS-1 has not yet been charged for his participation in the New Rochelle Robbery, and is providing information in the hope of obtaining leniency.  CS-1 has prior felony convictions for conspiracy to distribute narcotics, racketeering, use of a firearm during and in relation to a drug trafficking crime and crime of violence, access device fraud, and check fraud.  CS-1 also has prior misdemeanor convictions for criminal possession of a controlled substance and criminal possession of a weapon. Information provided by CS-1 has been proven reliable and has been corroborated.

supposed marijuana dealer who sold marijuana from California in the vicinity of Westchester County.

       b.    CS-1 asked if LEE would help him rob the dealer. Lee agreed to participate in the robbery.  LEE also told CS-1, in substance and in part, that an individual named "Boo" would also help with the robbery.  LEE agreed that he and "Boo" would carry firearms during the robbery.

       c.    LEE told CS-1 that LEE would bring duct tape to restrain the victim during the robbery.

       d.    CS-1 and LEE discussed how they would divide the proceeds of the robbery between themselves and "Boo," agreeing that CS-1 would receive six pounds of marijuana, LEE would receive four pounds of marijuana, and "Boo" would receive half of a pound of marijuana.

    5.    On or about December 30, 2018, HIBAH LEE, a/k/a "Vicious," the defendant, spoke to CS-1 by telephone.  I and other members of law enforcement recorded and monitored this call.  During this call, LEE and CS-1 said, in substance and in part, the following:

       a.    LEE told CS-1 that his car had a flat tire and that, therefore, they could not do the robbery that day.

       b.    LEE asked whether CS-1 could arrange for the robbery to occur on a later date.  CS-1 told Lee that he would try to set it up for a later date.

       c.    LEE said that CS-1 should buy some marijuana from the victim in order to make the victim feel comfortable dealing with CS-1.  CS-1 said that he should show the victim money, and asked whether LEE could give him money for that purpose.  LEE said that he would do so.

    6.    On or about January 4, 2019, I and other members of law enforcement observed CS-1 place a FaceTime video call to HIBAH LEE, a/k/a "Vicious," the defendant, and recorded the audio component of the call.  When CS-1 placed this call, an individual referred to as "Boo," who I later identified to be CARL SCOTT, a/k/a "Boo," the defendant, was already connected to LEE through FaceTime, allowing CS-1, SCOTT, and LEE to communicate with each other.  During this call, LEE, SCOTT, and CS-1 discussed when to arrange to rob the marijuana dealer that

3

CS-1 had described to LEE on December 28, 2018.  LEE, SCOTT, and
CS-1 said, in substance and in part, the following:

      a.    SCOTT asked whether CS-1 could arrange to meet
the dealer on January 7, 2019 or during the weekend spanning
January 5, 2019 to January 6, 2019.

      b.    CS-1 asked whether LEE and SCOTT could do the
robbery on January 6, 2019, and LEE and SCOTT said they could.
CS-1 stated that he would contact the robbery victim and try to
arrange a meeting with him on Sunday.

      7.    On or about January 7, 2019, I and other members of
law enforcement outfitted CS-1 with a recording device (the
"Recording Device"), and conducted surveillance of CS-1.  Acting
at my direction, CS-1 had spoken with HIBAH LEE, a/k/a
"Vicious," the defendant, earlier in the day, and arranged to
meet with LEE and CARL SCOTT, a/k/a "Boo," the defendant.
During the course of the surveillance, which began in the
apartment building where CS-1 resides (the "Apartment
Building"), I and other members of law enforcement observed CS-1
exit the Apartment Building and enter a White Mercedes sedan
(the "Vehicle").  Subsequently, CS-1, LEE, and an individual I
later identified as SCOTT exited the Vehicle and entered the
Apartment Building.  CS-1, LEE, and SCOTT later exited the
Apartment Building, reentered the vehicle, and drove to a hotel
in Westchester County (the "Hotel").  Additionally, I have
reviewed the recording from the Recording Device during the
period in which I and other members of law enforcement conducted
surveillance, and discussed the recording with CS-1, who
reviewed portions of the recording with me and identified the
voices of the speakers therein.  Based on my conversations with
CS-1; my surveillance of CS-1, LEE and SCOTT on January 7, 2019;
and my review of the recording made by the Recording Device on
January 7, 2019; I have learned the following:

      a.    After meeting with LEE and SCOTT, CS-1 stated
that he met with the marijuana dealer that the three men had
planned to rob.  CS-1 stated that the dealer had twelve pounds
of marijuana, and CS-1 had seen the marijuana and tried a sample
of it.

      b.    After meeting up with LEE and SCOTT, CS-1 stated
that they should travel to the location where the dealer was
staying to conduct surveillance of the site of the planned
robbery.  LEE asked whether they should be armed with guns, and

CS-1 said that guns would not be necessary because they were only going to gather information, not carry out the robbery.

      c. Subsequently, LEE, SCOTT, and CS-1 entered the Vehicle, with LEE in the driver's seat. LEE asked CS-1 for directions to the site of the planned robbery. CS-1 replied that he was putting the location in his navigation system, and gave LEE directions to the Hotel.

      d. LEE, SCOTT, and CS-1 traveled to the Hotel in the Vehicle. After arriving, LEE parked, exited the Vehicle, and entered the lobby of the Hotel while CS-1 and SCOTT waited in the Vehicle. After LEE reentered the Vehicle, he said that the Hotel required guests to book rooms using a credit card or to provide a form of identification if the guest wanted to pay in cash. Subsequently, LEE, SCOTT, and CS-1 drove in the Vehicle around the parking area in the vicinity of the Hotel.

      e. While LEE, SCOTT, and CS-1 were in the Vehicle and in the vicinity of the Hotel, LEE stated, in part and in substance, that the robbery should take place inside a room in the Hotel, and stated that the three men should take care to avoid surveillance cameras when carrying out the robbery.

      f. While LEE, SCOTT, and CS-1 were in the Vehicle and in the vicinity of the Hotel, CS-1 stated that the three men should tie up the robbery victim and leave the room after carrying out the robbery. CS-1 stated that because the plan was to rob the victim of narcotics, he could not complain about the robbery to the authorities. In response, LEE stated that the victim could tell the authorities that his wallet was stolen. CS-1 responded that since the plan was to tie the victim up during the robbery, the three would be gone by the time the victim would be able to complain about the robbery.

      g. Around the time LEE, SCOTT, and CS-1 were in the Vehicle and in the vicinity of the Hotel, CS-1 stated that they could gain entry into the victim's room if they brought money with them to the robbery, and LEE agreed that they could bring money to the robbery. LEE then said that they should enter the victim's room with guns drawn.

      h. LEE, SCOTT, and CS-1 eventually left the vicinity of the Hotel in the Vehicle. After leaving the vicinity of the Hotel, while LEE, SCOTT, and CS-1 were in the Vehicle, CS-1 said that the three men should take the victim's phone during the

course of the robbery.  SCOTT stated that they should tie him up with a telephone cord and tape.

   i.    While CS-1, SCOTT, and LEE were driving in the Vehicle, they were pulled over by other members of the FBI Safe Streets Task Force, who conducted a traffic stop.  I spoke to one of the members of the task force ("Officer-1") who conducted that traffic stop, and learned that Officer-1 photographed identification cards given to him by the individuals inside vehicle.  I reviewed the photographs taken by Officer-1, and learned the following:

   i.   Officer-1 photographed a driver's license bearing an individual's photograph and the name "Carl Scott" (the "Carl Scott ID Card").  I have reviewed a photograph of SCOTT, the defendant, from criminal history records maintained by law enforcement, and believe that SCOTT is the individual depicted in the Carl Scott ID Card.

   ii.  Officer-1 photographed a driver's license bearing an individual's photograph and the name "Hibah Lee" (the "Hibah Lee ID Card.")  I have reviewed a photograph of LEE, the defendant, from criminal history records maintained by law enforcement, and believe that LEE is the individual depicted in the photograph on the Hibah Lee ID Card.

   8.    Based on my training, experience, and participation in this investigation, I believe that HIBAH LEE, a/k/a "Vicious," the defendant, and CARL SCOTT, a/k/a "Boo," the defendant, drove to the Hotel in order to plan how they would carry out a robbery of a marijuana dealer and gather information concerning the site of the planned robbery.

WHEREFORE, the deponent respectfully requests that HIBAH LEE, a/k/a "Vicious," and CARL SCOTT, a/k/a "Boo," the defendants, be arrested, and that they be imprisoned or bailed, as the case may be.

JAMES MENTON
Task Force Officer
Federal Bureau of Investigation

Sworn to before me this
14th day of January 2019

HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York